UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARCO ANTHONY CARMONA,

    Plaintiff,

    v.

JOE McGRATH, Warden; et al.,

    Defendants.
                             /

No. C 05-2219 MHP (pr)

**ORDER GRANTING SUMMARY JUDGMENT AND DISMISSAL**

## INTRODUCTION

This case is now before the court for consideration of defendant Ater's motion for summary judgment. For the reasons discussed below, the motion will be granted. Defendant Ater is entitled to judgment as a matter of law on the merits of the Eighth Amendment claim and on his defense of qualified immunity. The claims against the other defendants will be dismissed.

## BACKGROUND

The following facts are undisputed unless otherwise noted:

The incident that gives rise to Marco Carmona's complaint occurred on February 24, 2004, while he was incarcerated in the security housing unit ("SHU") at Pelican Bay State Prison. The California Department of Corrections operational procedure manual describes the purpose and objective of the SHU:

> The SHU is designed to maximize control of inmates who pose a definite and serious threat to the safety of others or themselves.  SHU inmates may also be deemed a threat to the security of the institution for escape, major destruction of property, or activities leading to disorder. . . . [¶]  The SHU is a segregated housing complex, which serves to place extreme limits on inmate opportunity for violent and disruptive behavior.  The SHU provides physical controls to prevent disorder and provide protection for others.  The close supervision of the SHU inmates affords an opportunity to observe inmate behavior and, if necessary, intervene with mental health services or stricter controls.

Opposition brief, Ex. H, p. AGO-0001.  The SHU is made up of several pods, and each pod in facility D of the SHU has two tiers with four cells on each tier for a total of 8 cells per pod.  Id. at AGO-0002; Complaint, p. 12.

The parties disagree about whether inmates were ever allowed to move about the SHU without restraints.  Defendant Ater states that inmates must be moved while restrained in double-locked handcuffs and sometimes also leg irons.  Carmona states that he normally was able to move about the pod without an escort and without handcuffs.  Their disagreement is not material to the present action because, regardless of whether restraints were or were not always required, the parties agree that Carmona and Garcia were initially let out of their cell unrestrained to pack up their property for a cell move and to be searched, that only after they refused to move did prison officials determine they needed to be put in handcuffs, and that Carmona and Garcia then refused the orders to submit to handcuffing.

At about 9:00 a.m. on February 24, 2004, correctional officer Harkins told Carmona and his cellmate, Hector Garcia, they were being moved to different housing.  He told them to pack their personal belongings on carts but refused to tell them where they were being moved to or why they were being moved.  Carmona and Garcia packed their property on two moving carts.  They were strip-searched at about 9:40 a.m.  Correctional officer Gaylord told them they were being moved to "F" pod "behind glass."  Complaint, p. 13.

A cell "behind glass" refers to one that has a Lexan plexiglass-type front to reduce an inmate's ability to assault passersby with food, body fluids, feces, and weapons.  See id. at 13 and n.3.  Carmona and his cellmate were outside their cell and were cooperative until they learned they were going to be moved to a cell with a Lexan front.  Garcia yelled to another inmate in F pod and learned that there was an available cell behind glass.

2

When Carmona and Garcia found out they were to be moved behind glass, they refused to move. Carmona and Garcia were ordered by C/O Harkins to "cuff up" (i.e., submit to be handcuffed) but they refused. They refused to be moved because they had not received the paperwork for the move. In response to the inmates' refusal, their cell door was shut and they were now outside their cell and in the pod.

At approximately 9:55 a.m. sergeant Navarro came to the area and told Carmona and Garcia "cuff up. We're going to move both of you behind glass." Id. at 13. The inmates continued to refuse and wanted to discuss the matter to obtain an explanation for the move. Garcia explained that they had been in the same cell for over 3 years without any problems and there was no reason to move them. Garcia asked to have the cell door opened so they could return to their original cell. Sergeant Navarro said "better cuff-up or I will bring the extraction team and make it very painful for both of you." Id. at 14. Garcia responded that they wanted "an explanation or justification" for the move. Sergeant Navarro walked away.

While the inmates were out of their cell, a guard had aimed a 40 mm. launcher at them. A 40 mm. launcher is a rifle-like weapon that shoots hard rubber blocks. Id.

At about 10:00, Garcia picked up a blanket off the floor and put it on the stair rails. Carmona contends the blanket was put on the stair rails to dry; guards interpreted it as a barricade. See Ater Decl., ¶ 7 ("Inmates commonly use blankets as barricades during an extraction to conceal themselves, hide weapons, make the floor slippery with water, etc. This is a security concern. Direct-impact rounds will knock a blanket down if it has not been securely fastened. Otherwise a blanket will stop the direct-impact rounds.") Two control officers who were 30-35 feet away started shooting at Garcia with the 40 mm. launcher. Garcia grabbed the blanket and ran for cover under the stairs; Carmona continued to stand in front of cell # 116. The guards continued to shoot the 40 mm. launcher at Garcia, and one of the rounds hit Garcia in the head. Carmona was not hit by any of the rounds. Once the shooting stopped, Carmona walked to Garcia and tried to stop the blood with a towel given to him by inmates in another cell.

3

After Garcia had been shot, two medical technical assistants asked Garcia if he was okay and slipped some gauze under the pod door for him.  Carmona did not want to expose himself to being shot so he did not go to get the gauze.

After "awhile" -- about 45 minutes after Garcia had been hit, according to Carmona, see Complaint, Exh. C, p. 13 – lieutenant Swift came to the pod door and ordered the inmates to submit to handcuffs or a cell extraction team would enter.  Complaint, p. 16.  Carmona and Garcia still did not comply.  Carmona asked for a Spanish interpreter.  Captain Ater said, "I know Carmona and he understands English okay."  Id.  Carmona alleges that he has a limited ability to speak English and was communicating through Garcia, who spoke better English. Carmona presented no evidence and does not argue that he did not understand what the staff wanted him to do.   An order was given to remove Carmona and Garcia from the pod.

The pod door was opened, and two cell extraction teams (of 14 officers total) entered the pod wearing protective gear.  As they approached, Garcia and Carmona were standing in a "non-combatant/unaggressive manner," id. at 17, although neither inmate had signaled any willingness to submit to handcuffs.  When the extraction team got within about 7-8 feet of Carmona, an extraction team member squirted Carmona with oleoresin capsicum (i.e., pepper spray).  Immediately thereafter, Carmona was shot with a 40mm launcher by another officer. The rubber blocks hit Carmona's foot and outside thigh, causing Carmona to fall to the floor. Carmona was then sprayed again with pepper spray.  The extraction team piled on Carmona, forcefully put him on his stomach, twisted his arms and feet and put handcuffs tightly on his ankles and wrists.  Once pushed to the floor, Carmona did not resist the efforts to handcuff him.  After Carmona was handcuffed, he was yanked up from the floor by his arms and taken to a shower to have the pepper spray washed off.  After he was washed off, Carmona was taken for medical care in the clinic.  Carmona sustained a broken toe and a deep bruise and abrasion on his right thigh (with nerve damage) as a result of being shot with the hard rubber blocks.

Defendant Ater, the acting facility captain, authorized the use of force to extract Carmona and Garcia.  He explained in his declaration that inmates out in the pod

4

unrestrained posed a safety and security concern. "Officers would have been unable to respond to emergency situations concerning any of the other inmates in the pod without first restraining Plaintiff and Garcia because they could have attacked the responding officers. Also, regular daily activity such as escorting inmates to medical appointments, dental appointments, time on the yard, showers, etc. had to be stopped while Plaintiff and Garcia were out in the pod unrestrained." Ater Decl., ¶ 3. Ater explained that Carmona and Garcia "were provided a cool-down period of about an hour and a half from the time they stopped complying with the order to move to the time the extraction teams entered the pod." Id. at ¶ 5. This was longer than the normal 30-45 minute cooling down period before an extraction and was intended to give the inmates an opportunity to voluntarily submit to restraints without the need for force. Id.

Ater explained the reasons for the several different methods of force used on Carmona. Pepper spray affects vision and makes it difficult to breath, causing "an inmate to become disoriented and [] unable to resist being restrained." Id. at ¶ 10. When the extraction teams entered, the inmates posed a security concern because they were standing when they had been ordered by sergeant Navarro to lay face down on the floor. "Thus, direct-impact rounds were fired at Plaintiff's legs in an effort to get him to drop to the floor. Plaintiff was struck in his right foot and thigh. The use of the direct-impact rounds prevented the extraction from escalating to a dangerous physical altercation." Id. at ¶ 11. When Carmona fell to the floor, physical "force was used to restrain him in order to prevent him from reaching for a weapon he may have concealed." Id. at ¶ 12. There is no evidence that either inmate had a weapon at any time during the incident or did anything more aggressive than refuse to assume the position to be handcuffed.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred in Del Norte County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

5

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). The court will consider the statements of fact in Carmona's verified complaint in addition to his opposition papers in evaluating the motion.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The

evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

**DISCUSSION**

A.　Eighth Amendment Claim

A prisoner has the right to be free from cruel and unusual punishment, including physical abuse by guards. Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1, 6 (1992) (citing Whitley v. Albers, 475 U.S. 312, 317 (1986)). In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. See Hudson, 503 U.S. at 7; see also Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979) (guards may use force only in proportion to need in each situation).

Carmona incorrectly argues that the mental state of "deliberate indifference" applies to this case, i.e., that defendants could be liable if they were deliberately indifferent to a risk of harm if they used force on him. See Opposition, pp. 9, 28. Defendants' response to an ongoing disturbance is governed by the "malicious and sadistic" standard for the use of force rather than the "deliberate indifference" standard that applies when considering a prison condition. See Hudson, 503 U.S. at 7 ("Extending Whitley's application of the 'unnecessary and wanton infliction of pain' standard to all allegations of force works no innovation," whether the prison disturbance is a riot or a lesser disruption); cf. Jeffers v. Gomez, 267 F.3d 895, 913 (9th Cir. 2001) ("Because this contention does not target behavior occurring during an ongoing prison security measure, the 'deliberate indifference' standard governs.") The length of the incident and the absence of imminent danger to human life or property are

7

relevant to the inquiry but do not mean that the legal standard changes.

Applying the several Hudson factors to the evidence before the court leads to the conclusion that the force used by defendants did not violate Carmona's Eighth Amendment rights.

First, there was a need for the use of some force against Carmona. He was one of two inmates who was unrestrained in a common area and presented safety and security concerns for staff and other inmates. As long as he and Garcia were out of their cell, normal activity in the pod was at a standstill. The area where this incident occurred has higher security concerns than the prison's general population, houses inmates who have been deemed particularly violent or have shown an inability to function in the general population, and physically isolates inmates to control them. At the time force was used on him, Carmona was refusing to be handcuffed, even knowing that force would be used to compel compliance and having had ample time to reflect on whether to submit to handcuffs.

Second, the amount of force used was reasonably related to the need for that force. The evidence shows the extreme resolve of Carmona and Garcia not to comply with the orders. They refused the initial orders to move and to submit to handcuffs. They continued to refuse after they were told that it would be painful if they did not comply. They continued to refuse to submit to handcuffs even after Garcia was hit in the head by a hard rubber block shot from the 40mm launcher. They refused another verbal order to submit to handcuffs. They refused an order to lay down on the ground and refused to submit to handcuffs when they knew the extraction team was about to enter the pod. Even when the extraction team entered the pod, Carmona did not comply with orders to get down on the ground and submit to handcuffing. Three different kinds of force were applied to subdue Carmona, with the intent that their combined effect would bring him to the ground and in a position to be forcibly handcuffed. Carmona was squirted with pepper spray and hit with a shot to his right toe, but it was not until he was shot in the thigh with a rubber block that he fell to the ground; even then, he didn't lay down purposely but instead fell down when the shot to his thigh caused him to lose control of his leg. It is not at all clear what lesser method might have

8

worked to end the disturbance.

Third, the extent of the injury inflicted was serious. Carmona sustained a broken toe and a deep bruise to his thigh as well as the temporary effects of pepper spray. Although his leg was not broken, the medical records he submitted showed that his leg was seriously injured.

Fourth, the threat reasonably perceived by the responsible officials was significant. Two inmates housed in a most restrictive prison setting were unambiguously choosing not to follow orders that pertained to prison security. No other inmates safely could be released from their cells and the staff could not enter the pod safely while these two inmates were out and unrestrained. While there was no immediate threat to human life, there was a serious threat to prison security.

Carmona suggests he and his cellmate could not have posed any threat because they had just been strip-searched and were in undershorts and t-shirts. However, they had access to other inmates and ample time and ability to obtain a weapon from another inmate in the pod – an ability evidenced by the fact that they were able to obtain a towel from an inmate in another cell to tend to Garcia's scalp wound. Moreover, even an unarmed inmate need not be considered completely harmless as he can still physically fight with persons who try to subdue him.

Fifth, defendants tried to temper the force that they used. Before Carmona was touched by any defendant, correctional staff tried using numerous verbal commands to get him to submit to handcuffs and tried a cool-down period of about 45 minutes to secure compliance without the need for use of force. Force was employed on Carmona only after the inmates refused to comply with orders, were allowed considerable time to change their minds, and again refused to comply with orders. There is no evidence that Carmona ever intended to submit voluntarily to being handcuffed. The use of the 40 mm. launcher and pepper spray, as well as physically tackling Carmona were tempered uses of force in response to the dangerous situation presented by two inmates who refused to submit to restraints. The evidence clearly does not support Carmona's argument that "excessive force

9

was the first option used by correctional officials." Opposition, p. 12.

The overriding theme of Carmona's opposition was that he could rightfully refuse to comply with an order to submit to restraints and a cell move unless and until he received an explanation for the decision. <u>See, e.g.,</u> Opposition, p. 11, 14, 16, 17, 23, 26-27, 33, 36, 38. Other than two short sentences on the 40th page of his opposition brief – where he admits he was wrong to refuse to move without an explanation and was wrong to refuse to be handcuffed – Carmona remains adamant that he had no obligation to comply with the order until he received an explanation for the move. The law does not support Carmona's view. He has not pointed to a single case that provides legal support for his contention that prison officials must provide a satisfactory explanation for an order before an inmate is obliged to follow it. If an inmate disagrees with the lawfulness of an order, he can file an inmate grievance and perhaps a court case. There may be that extremely rare situation where the order is so blatantly illegal and dangerous – such as a command to "come over here so I can shoot you in the face" -- that a prisoner might rightfully disobey the order. This wasn't such a situation, nor did it come anywhere near to being such a situation. The correctional staff's failure to explain the reasons for the orders to submit to handcuffs and move to a new cell is, in a nutshell, legally irrelevant. To rule otherwise would result in chaos in the prisons by making compliance with orders negotiable and optional: inmates could pick and choose which orders to follow, could delay compliance with orders by demanding explanations, and could refuse to comply with orders for which they found the explanations unsatisfactory. This is not to say that disobedience of an order gives prison officials carte blanche to use whatever force they choose on the disobedient prisoner, as their conduct is subject to judicial and administrative review.

Carmona also contends that the correctional staff failed to properly document and videotape each use of force. These bureaucratic concerns are irrelevant to determining whether there was an Eighth Amendment violation.

Although Carmona and Garcia asked for a Spanish interpreter because Carmona's English skills were limited, there is absolutely no evidence that Carmona did not understand

what was expected of him by the correctional staff. Additionally, Carmona apparently wanted the interpreter so he could receive and understand the reasons for the cell move and use of force. See Opposition, p. 12. But he had no right to such an explanation in either English or Spanish.

The undisputed evidence shows that (1) Carmona was repeatedly ordered to submit to being handcuffed, (2) he refused to comply with the orders, (3) the guards informed Carmona and his cellmate that if they didn't comply with the order, a cell extraction would be sent in to enforce compliance and it would hurt, (4) Carmona and his cellmate continued to fail and refuse to submit to handcuffing, (5) even after his cellmate was shot and hit with a rubber block, Carmona did not submit to handcuffs, and (6) about 20 minutes passed between the inmates' initial refusal to submit to handcuffs and the time the rubber blocks were first shot at the cellmate, and about 45 more minutes passed before any force was applied to Carmona. At the time Carmona was subjected to the force – i.e., being shot with rubber blocks, being pepper-sprayed and being tackled by an extraction team -- the guards confronted a situation where two inmates were out of their cell in the SHU and were refusing to comply with orders to be handcuffed. Viewing the evidence in the light most favorable to Carmona, no reasonable jury could find that defendants applied force maliciously and sadistically for the very purpose of causing harm. Carmona failed to establish a triable issue of fact as to whether he was subjected to excessive force by defendants. Defendant Ater is entitled to judgment as a matter of law on the Eighth Amendment claim.

B.  Qualified Immunity Defense

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" Burns v. Reed, 500 U.S. 478, 495 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court set forth a particular sequence of questions to be considered in determining whether qualified immunity exists. The court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Id.</u> at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. <u>See id.</u> If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 201-02 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).

The first step under <u>Saucier</u> is to determine whether there was a constitutional violation. As discussed above, the evidence in the record does not establish an Eighth Amendment violation. The analysis need not proceed to the second step of the <u>Saucier</u> analysis. Defendant is entitled to judgment as a matter of law on the qualified immunity defense.

C.      <u>The Unserved Defendants</u>

The complaint in this action had 40 named defendants, 44 Doe defendants and (with exhibits) was 200+ pages long. When the court did its initial screening under 28 U.S.C. § 1915A, it used an unusual approach to avoid a potentially needless waste of paper and resources by serving the complaint only on the one defendant who appeared to be in charge and seeing what developed. The court explained in the initial review order:

> This is a difficult case because the complaint presents a rather clear picture of what happened that day. Even though a lot of force was used, it appears extremely unlikely that Carmona will prevail on his claim that it was excessive. However, the court is not prepared to say as a matter of law that the force used on Carmona was not excessive. The court will require a fuller picture to make its determination because, when the court considers only what is pled in the complaint, the need for the force used under the circumstances is not alleged. For example, Carmona does not plead

12

> that he needed to be handcuffed, why he needed to be handcuffed, what security issues were presented by un-handcuffed inmates out of their cell, whether there are special security concerns in the SHU, and why prison staff decided to use three different methods of force at the same time in order to handcuff Carmona. Although some of this information is rather easily imagined, that would require the court to speculate on the reasons and the need for the force used. For these reasons, the court is unwilling to dismiss the complaint for failure to state a claim upon which relief can be granted. On the other hand, it is extremely unlikely that Carmona can prevail based on what he has described in the complaint. It therefore is not a good expenditure of limited resources to have the summons and 200+ page complaint and exhibits copied and served on the dozens of named defendants at this time.
>
> The court will attempt to chart a middle course and will have the complaint served on a single defendant and let the case proceed through the summary judgment stage with that one defendant. The summons and complaint will be served on facility captain M. Ater, who apparently made the decision to use force. See Complaint, ¶ 8 and Exh. A, p. 7. If, upon considering the motion for summary judgment (or notice that one will not be filed), the court determines that the case cannot be resolved at the summary judgment stage, the court will then order service on other defendants involved in the use of force. Carmona is cautioned that he must present his very best arguments and facts in opposition to any motion for summary judgment from the one defendant now being served because if that one defendant provides adequate evidence on the need for the force used, that may end Carmona's claims against all the defendants.

Order Of Service And Partial Dismissal, pp. 6-7.

After being served with process, Ater moved for summary judgment. Carmona filed a lengthy opposition to the motion for summary judgment. There is no suggestion in the complaint, the motion for summary judgment or the opposition to the motion that the analysis differs for defendant Ater as opposed to the many other defendants. As discussed above, the use of force was a considered decision and done pursuant to Ater's commands.

Now that the evidence has been developed, it is clear that there is no real dispute about what happened on the day force was used and the force used did not amount to an Eighth Amendment violation. The court therefore will dismiss the action as against all the unserved defendants. The particular legal bases for the dismissal are the in forma pauperis statute and the general prisoner screening statute, both of which allow the court to dismiss the complaint if it is frivolous, malicious or fails to state a claim upon which relief may be granted. 28 U.S.C. § 1915(e)(2)(b)(i & ii); 28 U.S.C. § 1915A(b). In light of the determination that there was no Eighth Amendment violation as a matter of law, Carmona's further pursuit of the claims against the unserved defendants would be frivolous in that there

13

is no factual or legal merit to the claims.

## CONCLUSION

For the foregoing reasons, defendant Ater's motion for summary judgment is GRANTED. (Docket # 14.) Ater is entitled to judgment as a matter of law. The Eighth Amendment claim will be dismissed with respect to the remaining defendants. Because all claims over which the court has original jurisdiction have now been resolved, the court declines to exercise supplemental jurisdiction over the state law claims. See 28 U.S.C. § 1367(c)(3). The state law claims are dismissed. The clerk shall close the file.

IT IS SO ORDERED.

Dated: July 28, 2006

_____
Marilyn Hall Patel
United States District Judge